**UNITED STATES of America, Plaintiff–Appellee,**

**v.**

**Luis P. COSTA, Jose M. Barros, Carlos D. Bicho, Defendants–Appellants.**

**No. 93–6113.**

United States Court of Appeals, Eleventh Circuit.

Sept. 13, 1994.

Melissa A. Posey, Mobile, AL, for appellants.

J.B. Sessions, III, U.S. Atty., Charles A. Kandt, Asst. U.S. Atty., Mobile, AL, for appellee.

Before ANDERSON and DUBINA, Circuit Judges, and ESCHBACH *, Senior Circuit Judge.

DUBINA, Circuit Judge:

Appellants Jose Barros–Zao ("Barros–Zao"), Carlos Bicho ("Bicho"), and Luis Costa ("Costa") appeal their convictions of one count of conspiracy to possess with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2, and one count of possession with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Because we hold that the district court improperly admitted certain hearsay evidence at the defendants' trial, we reverse the judgments of conviction and remand for a new trial.

## I. FACTUAL BACKGROUND

On July 3, 1992, defendants Barros–Zao, Bicho, and Costa, along with Mario DaCosta, were arrested near Montgomery, Alabama. All three defendants are originally from Portugal, but at the time of their arrest they were residents of Canada. Both Barros–Zao and Costa were employed as delivery truck drivers for a fish supply company owned by Manuel DaCosta, the brother of Mario DaCosta. Bicho operated a fish market in Montreal. Mario DaCosta worked for his brother Manuel.

Previously, on June 27, 1992, Mario DaCosta and other co-conspirators, who are not involved in the present case, met with undercover agents for the United States Customs Service in New York City to negotiate the delivery of 110 kilograms of cocaine. At this meeting, an initial payment of $300,000 was made, and it was agreed that delivery would take place several days later in the Montgomery, Alabama area. On June 29, 1992, in a tape recorded telephone conversation between Manuel DaCosta and undercover customs agent Blas, Manuel DaCosta stated that Mario DaCosta would pick up the cocaine on July 3, 1992.

On July 1, 1992, Mario DaCosta and the three defendants travelled to Atlanta, Georgia. The following day, Bicho rented a Cadillac, listing Mario DaCosta as a second driver, and Barros–Zao rented a van, listing Costa as a second driver. Later that day, the group drove to Montgomery, Alabama, where they spent the night in a hotel. Both that evening and the next day, Mario DaCosta made several telephone calls to agent Blas, coordinating the delivery of the cocaine.

On July 3, 1992, Mario DaCosta and the defendants drove to the Owassa Truck Stop where they met undercover customs agents

* Honorable Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

Blas and Mixon. Although these agents had dealt with Mario DaCosta previously, this was their first and only contact with the defendants. Mario DaCosta and Costa then followed the agents to a nearby interstate rest area where Blas handed Mario DaCosta the keys to a rented Lincoln Towncar. The cocaine was in the trunk of the Lincoln, but Costa never opened the trunk to confirm this. Mario DaCosta and agent Blas discussed arrangements for payment of the balance of the purchase price. Surveillance photographs were taken of Mario DaCosta and Costa at the rest area. Mario DaCosta and Costa then returned to the truck stop, with Costa driving the Lincoln. After a brief discussion, Mario DaCosta and the defendants set off for Atlanta. Costa drove the Lincoln. Bicho drove the van, and Mario DaCosta drove the Cadillac; Barros–Zao rode with Mario DaCosta.

As the group was getting on the interstate, a secret kill switch installed in the Lincoln caused it to stall. The other two vehicles then pulled off the interstate ahead of the Lincoln. Bicho waited in the van, while Mario DaCosta doubled back to check on the Lincoln. Meanwhile, Alabama state troopers arrived at the Lincoln to give assistance. After Costa consented to a search, the troopers discovered the cocaine and arrested Costa. Seeing the troopers, Mario DaCosta fled the area, but was apprehended shortly thereafter along with Barros–Zao. Bicho, who was found still waiting on the side of the interstate, was also arrested. At that time, it was discovered that some of the screws holding the van's interior molding in place were removed and that the interior molding panels were loosened.

Once in custody, Mario DaCosta was interrogated by a customs agent and a DEA agent. One of the interrogators, Agent Barnette, informed Mario DaCosta that he was in serious trouble and facing life in prison. Agent Barnette also informed DaCosta that if he provided a truthful statement that qualified as substantial cooperation with the government, Barnette would make DaCosta's cooperation known to the United States Attorney. DaCosta then made a lengthy statement in which he changed his story three times. The final version of DaCosta's confession also implicated the three defendants. In particular, Mario DaCosta stated that the defendants knew that the purpose of the trip was to pick up cocaine. Mario DaCosta's custodial confession is the only direct evidence that the defendants were knowing members of a conspiracy. While in custody, Costa also gave a statement that was subsequently used against him at trial.

Barros–Zao and Costa claim that Mario DaCosta had asked them to make the journey to Montgomery in order to pick up and deliver a "shipment" for Manuel DaCosta. They claim they did not know that the "shipment" was cocaine. Bicho claims that Mario DaCosta invited him to come on the trip in order to check out seafood suppliers along the gulf coast after seeing the two drivers off with a "shipment." Bicho also denies knowing that the real purpose of the trip was to pick up cocaine.

## II. PROCEDURAL HISTORY

Although the defendants were initially to be tried jointly with their codefendant Mario DaCosta, the district court granted a motion pursuant to *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), to sever the trial of Mario DaCosta from that of the defendants. Under *Bruton,* severance is necessary where the government seeks to introduce at trial a custodial confession of a non-testifying defendant that incriminates both the defendant and his codefendants and where a limiting instruction would be ineffective to prevent a violation of the codefendants' constitutional rights of confrontation and cross-examination.

Mario DaCosta was tried first. Although Mario DaCosta took the stand at his own trial and recanted his custodial confession, he was convicted of both counts. Subsequently, at the trial of the defendants, Mario DaCosta invoked his Fifth Amendment right against self-incrimination and refused to testify. Despite a grant of use immunity by the government, Mario DaCosta persisted in his refusal and was held in contempt by the district court. Given the self-imposed unavailability of Mario DaCosta, the government proposed having Agent Barnette testify to Mario Da-

Costa's custodial confession. The defendants objected on the grounds that Mario DaCosta's confession was inadmissible hearsay and would violate their constitutional right of confrontation. The district court, relying on *United States v. Garcia,* 897 F.2d 1413 (7th Cir.1990), ruled that the confession was admissible as a statement against penal interest under Rule 804(b)(3).

In addition, the district court ruled that the custodial statement of Luis Costa was admissible, but gave a limiting instruction that the jury consider the statement only with regard to Costa. The district court allowed other hearsay evidence against the defendants under the coconspirator exception to the hearsay rule. Fed.R.Evid. 801(d)(2)(E).

Ultimately, the defendants were convicted on both counts and sentenced accordingly. They then perfected this appeal. On appeal, the defendants present the following issues: (1) whether the district court erred in admitting the custodial confession of Mario DaCosta; (2) whether the district court erred in admitting the custodial statement of Luis Costa; (3) whether the district court erred in admitting other hearsay evidence under the coconspirator exception to the hearsay rule; (4) whether the defendants' convictions are supported by substantial evidence; and (5) whether the defendants' rights to a speedy trial were violated.

We hold that the custodial confession of Mario DaCosta is not genuinely against his penal interest to the extent that it directly inculpates the defendants and therefore is inadmissible under Rule 804(b)(3). Because this error is not harmless, we reverse the defendants' convictions and remand for a new trial. We further hold that the custodial statement of Luis Costa is not hearsay and that its admission at trial did not violate the defendants' confrontation rights. We also hold that the defendant's speedy trial claim is meritless and thus do not address it further. Because we remand for a new trial, we need not decide the remaining issues presented in this appeal.

## III. DISCUSSION

The district court held that the custodial confession of Mario DaCosta was admissible under Rule 804(b)(3). In this circuit, a hearsay statement that inculpates the accused is admissible under Rule 804(b)(3) as a statement against penal interest only if (1) the declarant is unavailable; (2) the statement so far tends to subject the declarant to criminal liability that a reasonable person in his position would not have made the statement unless he believed it to be true; and (3) the statement is corroborated by circumstances clearly indicating its trustworthiness. *United States v. Alvarez,* 584 F.2d 694, 699–701 (5th Cir.1978);[1] *United States v. Sarmiento–Perez,* 633 F.2d 1092, 1101 (5th Cir. Unit A Jan. 1981). With regard to the second prong of this test, whether a statement is genuinely against interest is purely a question of law and we review the district court's determination on this issue *de novo. Alvarez,* 584 F.2d at 701. Because we hold that the custodial confession of Mario DaCosta was not genuinely against his penal interest to the extent that it directly implicated the defendants in a conspiracy, we will restrict our analysis to this prong of the against penal interest exception.

In the recent case of *Williamson v. United States,* — U.S. ——, ——, 114 S.Ct. 2431, 2437, 129 L.Ed.2d 476 (1994), the United States Supreme Court reiterated that "[t]he question under 804(b)(3) is always whether the statement was sufficiently against the declarant's penal interest 'that a reasonable person in the declarant's position would not have made the statement unless believing it to be true,' and this question can only be answered in light of all the surrounding circumstances." Whether or not a statement is truly against interest depends on a fact-intensive inquiry of the surrounding circumstances. *Id.* at ——, 114 S.Ct. at 2437. In the present case, the district court ruled

1. The decisions of the United States Court of Appeals for the Fifth Circuit (the "former Fifth" or the "old Fifth"), as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, are binding as precedent in the Eleventh Circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981).

that the portion of Mario DaCosta's custodial confession that inculpated the defendants was against his penal interest without conducting such an inquiry.

Instead, the district court based its ruling on the Seventh Circuit's decision in the case of *United States v. Garcia,* 897 F.2d 1413 (7th Cir.1990), in which that court held that a custodial confession of a non-testifying defendant inculpating a codefendant was admissible under Rule 804(b)(3). In *Garcia,* the court held that the confession implicating both defendants was against the penal interest of the declarant because it was probative of the declarant's guilt. *Id.* at 1420. In our view, the *Garcia* court's analysis of whether a custodial confession implicating a codefendant is genuinely against the penal interest of the declarant does not adequately take into account the circumstance that the confession was made while in custody.

"As [the Supreme Court] has consistently recognized, a codefendant's confession is presumptively unreliable as to the passages detailing the defendant's conduct or culpability because those passages may well be the product of the codefendant's desire to shift or spread blame, curry favor, avenge himself, or divert attention to another." *Lee v. Illinois,* 476 U.S. 530, 545, 106 S.Ct. 2056, 2064, 90 L.Ed.2d 514 (1986). "The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination." *Bruton,* 391 U.S. at 136, 88 S.Ct. at 1628. The view that custodial confessions that implicate other codefendants often are not genuinely against the penal interest of the declarant is also reflected in the Advisory Committee Notes to Rule 804(b)(3), which state:

> Whether a statement is in fact against interest must be determined from the circumstances of each case. Thus a statement admitting guilt and implicating another person, made while in custody, may well be motivated by a desire to curry favor with the authorities and hence fail to qualify as against interest.... On the other hand, the same words spoken under different circumstances, e.g., to an acquaintance, would have no difficulty in qualifying.
>
> . . . . .

Fed.R.Evid. 804 advisory committee's note.

In the case of *United States v. Sarmiento-Perez,* 633 F.2d 1092 (5th Cir. Unit A Jan. 1981), this circuit's predecessor considered the precise issue before us today and held that the custodial confession of a non-testifying, separately tried coconspirator/codefendant is not genuinely against penal interest insofar as it directly implicates the accused in the crime charged. In that case, the court drew a distinction between statements against penal interest that are offered to exculpate the accused and those that are offered to inculpate him. *Id.* at 1100. The distinction is made necessary by the fact that inculpatory statements implicate the confrontation rights of the accused whereas exculpatory statements do not. *Id.* Because the Supreme Court has chosen to ground confrontation values on the same bedrock of "reliability" that traditionally has been the grounding rationale for virtually all the exceptions to the hearsay rule, it is in practice difficult to discern the precise line of demarcation between the indicia of reliability that are sufficient to overcome confrontation problems and those that are sufficient to place an extrajudicial statement within the scope of a recognized exception to the hearsay rule. *Id.* at 1099–1100. Thus, the court stated, evidence that seems to fall afoul of the confrontation clause will most often fail to qualify for admission under any recognized hearsay exception. *Id.* at 1100.

Because the admission of a custodial confession of a non-testifying codefendant that inculpates the accused implicates the confrontation rights of the accused, this circuit subjects the reliability of such confessions—i.e., whether they are genuinely against the penal interest of the declarant—to a more exacting scrutiny than that applied by the Seventh Circuit in *Garcia.* As the court stated in *Sarmiento-Perez:*

> Given the advantages readily to be perceived in the incrimination of another for a crime in which the declarant himself is implicated, the circumstance that the incul-

patory-against-the-accused statement would have probative value against the *declarant* does not necessarily indicate that, insofar as it implicates the *accused*, it is sufficiently against the declarant's interest so as to be reliable.

*Id.* at 1101–02. Thus, even though such statements may appear on their face to violate the penal interest of the declarant, more evidence of reliability is required before they will be admitted under 804(b)(3).

We now turn to an analysis of the reliability of Mario DaCosta's custodial confession. At trial, Agent Barnette was allowed to testify at length as to the content of the confession. The portion of the confession that is at issue is that which directly attributes to the defendants' knowledge that the purpose of the trip to Alabama was to receive cocaine, the only direct evidence that the defendants were knowing members of a conspiracy. Particularly damning was Agent Barnette's testimony that:

> Mario said that Luis, when he picked up the car, that he knew he was going to pick up a hundred ten kilos of cocaine and that all four of the subjects; Luis Costa, Carlos Bicho, Jose Zao, Mario DaCosta discussed a hundred and ten kilos of cocaine from the time they left Newark, New Jersey until the time that they were arrested.

R7–611. The first part of the quoted passage, the one specifically addressing the knowledge of Luis Costa, is not even facially against the interest of Mario DaCosta and thus should not have been admitted. The remainder of the passage is facially against the interest of Mario DaCosta in that it implicates him in a conspiracy. As in *Sarmiento–Perez,* however, our analysis cannot end here, but must continue with a close examination of all the circumstances surrounding the making of the statement to determine whether it so contravenes DaCosta's penal interest that a reasonable person in his position would not have made the statement unless he believed it to be true.

"This was not a spontaneous declaration made to friends and confederates, but a custodial confession, given under potentially coercive circumstances that could not at trial—and cannot now—be adequately examined." *Sarmiento–Perez,* 633 F.2d at 1102. Not only was DaCosta in custody, but his interrogators had just told him that he was facing life in prison and that the United States Attorney would help him only if he provided substantial assistance. Thus, DaCosta had an obvious incentive to spread blame and curry favor with the authorities by implicating the defendants. In addition, anger resulting from the failure of his crime may have prompted DaCosta to implicate the defendants. Although DaCosta's interrogators claim they did not divulge to DaCosta any of their evidence against him, the fact that they knew when he was lying and the incredible chain of events that culminated in the defendants' arrest—i.e., the peculiar coincidences that the Lincoln just happened to stall and that the state patrol just happened to arrive immediately to provide assistance—certainly could have indicated to DaCosta that the government had a strong case against him already and that his best strategy would be to cut his own losses by implicating the defendants. Moreover, the interrogators' questions indicated to DaCosta that they suspected coconspirators other than the defendants. Thus, DaCosta had less to lose by naming the defendants as coconspirators as well. From these circumstances, which are not counterbalanced by circumstances indicating the reliability of the statement, it is reasonable to suppose that Mario DaCosta, and indeed a reasonable person in his position, might well have been motivated to misrepresent the role of others in the criminal enterprise, and might well have viewed the statement inculpating the defendants to be *in* his interest rather than against it.

Thus, we hold, as a matter of law, that Mario DaCosta's custodial confession is not genuinely against his interest to the extent that it directly inculpates the defendants in a conspiracy, and thus is not admissible under 804(b)(3). However, his confession would be admissible to the extent that it only implicates the defendants indirectly by, for example, allowing the jury to infer from DaCosta's knowledge of the cocaine and the defendants' presence in Alabama with DaCosta, that the defendants also knew of the cocaine.

Because DaCosta's confession was the only direct evidence against the defendants, it is highly probable that it contributed significantly to the jury's verdict. Accordingly we cannot say that its erroneous admission was harmless error. We need not find error of a constitutional proportion in order to find it reversible. *Sarmiento-Perez,* 633 F.2d at 1104. Because we are persuaded that the erroneous admission of DaCosta's confession, as the only direct evidence against the defendants, affected their substantial rights, substantial justice requires that we reverse the judgments of conviction and remand for a new trial pursuant to Fed.R.Civ.P. 61. *See Id.*

Given that we have now deemed the only direct evidence that the defendants were knowing members of a conspiracy inadmissible, upon remand, the district court will need to determine whether the remaining circumstantial evidence sufficiently links the defendants to a conspiracy to admit the hearsay statements of alleged coconspirators under Rule 801(d)(2)(E).

Finally, to assist the district court on remand, we address the defendants' claim that the district court erroneously admitted the custodial statement of Luis Costa. The basis of the defendants' objection is that Costa's statement is inadmissible hearsay and violates the confrontation rights of defendants Bicho and Barros-Zao. In the statement at issue, Costa stated that he met a certain "Tony" in a Newark, Portuguese bar, and that "Tony" asked him to travel with him to Alabama and to drive a car back to Newark. Costa denied being accompanied by anyone else on this trip and denied any knowledge that the car contained cocaine.

" 'Hearsay' " is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). Costa's statement is an obvious attempt to exculpate himself. The government offered the statement not for its truth, which would be absurd since the statement exculpates Costa and the government sought to inculpate him, but rather to show its falsity. By showing, through the introduction of other evidence, that Costa lied to his interrogators, the government sought to create an inference of Costa's guilt. Thus, Costa's statement is not hearsay.

The defendants also claim that Costa's statement violated the constitutional rights of Bicho and Barros-Zao to confront witnesses against them. Costa's statement, however, does not directly implicate the defendants. Rather, it implicates an unknown person referred to as "Tony." Costa's statement implicates Bicho and Barros-Zao only if the jury draws an inference that one of them is the mysterious "Tony," an inference that we note is not supported by any other evidence introduced at trial. Thus, Costa's statement implicates his codefendants only indirectly if at all. This circuit holds that "[o]nly those statements by a non-testifying defendant which directly inculpate a co-defendant give rise to the constitutional violation." *United States v. Veltmann,* 6 F.3d 1483, 1500 (11th Cir.1993). Accordingly, we hold that Costa's statement does not violate the defendants' confrontation rights. We find further support for this conclusion in the fact that the district court also gave a limiting instruction that the jury consider Costa's statement only with regard to his own liability and not that of his codefendants.

## IV. CONCLUSION

In sum, we hold that Mario DaCosta's custodial confession was not genuinely against his penal interest to the extent that it directly inculpated the defendants, and thus, we hold that the district court committed reversible error in that DaCosta's confession was the only direct evidence of the defendants' knowing participation in a conspiracy. In addition, we hold that the custodial statement of Luis Costa is not hearsay and that its admission by the district court did not violate the confrontation rights of defendants Bicho and Barros-Zao. We reverse the judgments of conviction and remand this action for a new trial consistent with this opinion.

REVERSED and REMANDED.