STATE OF NEBRASKA, APPELLEE, V.
JEREMY C. SHEETS, APPELLANT.
618 N.W. 2d 117

Filed September 15, 2000. No. S-97-1069.

J. William Gallup, of Gallup & Schaefer, for appellant.

Don Stenberg, Attorney General, and J. Kirk Brown for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

The appellant, Jeremy C. Sheets, was convicted on one count of murder in the first degree and one count of using a knife to commit a felony, and was sentenced to death on the murder charge. The crucial portion of the State's case, which was admitted into evidence, was the taped confession of Adam Barnett, an alleged accomplice to the crime. The confession was made pursuant to a plea agreement while Barnett was in custody. Statements in the confession implicated Sheets in the crimes. Barnett was not available to testify, as he committed suicide before trial. Sheets appealed, contending that the district court erred in admitting Barnett's taped confession. While this case was pending appeal, the U.S. Supreme Court, in June 1999, decided *Lilly v. Virginia*, 527 U.S. 116, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999). We then sustained the State's motion to submit supplemental briefs to discuss the impact of *Lilly*. These briefs were filed at the end of July 1999.

We determine that statements made in Barnett's confession do not fall within a firmly rooted hearsay exception or possess particularized guarantees of trustworthiness which would make cross-examination of marginal utility. Thus, we conclude that the admission into evidence of Barnett's taped confession violated Sheets' constitutional right to confrontation. Because the taped confession was the primary evidence against Sheets at trial, we conclude that the error was not harmless. Accordingly, we reverse, and remand for a new trial.

## BACKGROUND

On September 23, 1992, Kenyatta Bush, a 17-year-old senior at North High School in Omaha, Nebraska, disappeared from the school campus. Bush's body was found 10 days later in a ditch in Washington County, Nebraska. A pathologist determined that Bush had suffered three to four stab wounds to her throat and that she died of the incised lacerations to her neck, which severed the trachea, larynx, and all major blood vessels. Bruises found on her body were consistent with sexual assault. Investigating officers determined that the murder had been committed at another location and that Bush's body had been moved to the place where it was found.

The murder was still under investigation when, on September 17, 1996, Omaha police received a report from Barb Olson that Barnett had told her son-in-law, Jason LaNoue, that Barnett and Sheets were involved in the murder. The police then obtained statements from Olson; her daughter, Richelle LaNoue; and Jason LaNoue. As part of the investigation, Richelle LaNoue agreed to wear a concealed radio wire in order to secretly tape a conversation between herself and Barnett regarding the murder.

During the conversation between Richelle LaNoue and Barnett, Barnett implicated Sheets in the murder. Barnett stated that he had not actively participated in the crime, but had just driven the car. When Richelle LaNoue asked how Barnett could remain friends with Sheets, Barnett stated that "its not even you know, a (unclear) friendship anymore. He's had sex with my old lady and I don't know . . . ." Richelle then replied, "Yeah, [Barnett's girl friend] told me about that," and Barnett stated, "It's not even really a friendship really, it's sort of like (sighs)."

Barnett was taken into custody on September 27, 1996. Upon arrest, Barnett was taken to police headquarters and placed in an interview room. Two police officers informed Barnett of his *Miranda* rights, and Barnett agreed to speak with the officers. Barnett spoke with the officers for about 1 hour. During this time, he denied any involvement in Bush's murder and stated that Sheets had killed Bush. The interview terminated when Barnett asked to speak with an attorney.

A presiding judge appointed an attorney, who consulted with Barnett for several hours before Barnett was formally booked on a charge of homicide. On September 28, 1996, Barnett made an early morning request to detention personnel that he be allowed to contact his attorney. Barnett's attorney arrived at the police station around noon, after which he consulted with Barnett for several hours. Barnett's attorney then contacted police detectives and informed them that Barnett wished to make a statement regarding his involvement in the murder.

During this second statement to police, Barnett maintained that on the day Bush disappeared, she willingly entered the car and agreed to drive around and smoke marijuana with Sheets and Barnett. Barnett stated that when the three arrived at Dodge Park, Barnett stopped to urinate and was separated from Sheets and Bush. Barnett stated that when he rejoined them, Sheets had pinned Bush to the ground and was stabbing her. Shortly after providing police with this information, Barnett began to cry, and his attorney terminated the interview.

Following the second interview, Barnett's attorney negotiated a plea agreement with the county attorney on Barnett's behalf. According to a letter setting out the terms of the agreement:

> Mr. Barnett agreed to the following terms and conditions:
>
> 1. To make a full and truthful statement to law enforcement regarding the events and participation of individuals involved in the homicide of Kenyatta Bush;
>
> 2. To cooperate with reasonable requests of law enforcement, to include a tour of the various crime scenes and to make a telephone call to Mr. Jeremy Sheets in Maine for law enforcement purposes; and,

3. To testify truthfully at any trial involving Mr. Sheets in this matter.

In consideration for his performance of the above conditions, it was stated to Mr. Barnett personally, with Detective Bill Jadlowski and [Barnett's attorney] present, that [the Douglas County Attorney] agree[d] to the following:

1. Mr. Barnett will be allowed to plead to the reduced charge of Murder in the Second Degree;

2. [The Douglas County Attorney] would make arrangements for [Barnett's] safety and well-being during the time of incarceration prior to disposition of his case in the District Court, and would make a recommendation to the Department of Corrections to benefit Mr. Barnett in terms of placement for his safety and well-being after his sentencing in his case.

It was also agreed that a use of a weapon charge would not be filed against Barnett. At trial, Barnett's attorney testified that the sentence Barnett would receive for second degree murder had never really been discussed. However, Barnett's attorney also stated that a minimum sentence was something that could be hoped for. Barnett's attorney also testified that he had been told prior to making the agreement that Barnett was going to be charged with first degree murder. After Barnett's attorney consulted with Barnett about the plea agreement, a deputy county attorney and an Omaha police detective advised Barnett of the plea agreement and what was expected of him in return. At around 10:40 p.m. on September 28, 1996, Barnett gave a tape-recorded confession to the police. The statement provided in part:

[Barnett]: We were cruising around Omaha. It was earlier in the morning. We had been up tripping acid all night, piggybacking them. Um, we decided to go out and find a girl that we could have sex with. We drove up through North High about 10 o'clock in the morning. There she was out there, there was nobody else out there, it was the middle of school. Jeremy said 'There's the one, we can grab her'. So we pulled the car over and we both got out of the car and we grabbed her. . . . I was driving, Jeremy was in the back seat with her, he had a handkerchief, he stuck

it in her mouth, he sat back there and he held her. We proceeded to leave the school and we went down to Dodge Park. We parked, right by where I told you before.

[Officer]: Why don't you describe that location to me again as best you can will you?

[Barnett]: [Describes location in detail and sighs]. We got her out of the car, we walked about a half mile up the trail and we decided we were going to rape her right there. And we took off her clothes and he proceeded to have sex [with] her for like ten minutes. And then he started beating her, he had his knife in his hand, wasn't open - it was just - it was folded shut. Using it sort of like to make his hand more like a rock you know.

[Officer]: Uh huh (affirmative).

[Barnett]: (Sighs) And I was holding her down and he was beating her, he didn't stop, he kept beating her. Finally I stood up and I took about three steps back. (Lets out a breath) That's when he took out - that's when he took the open blade of the knife out, stabbed her in the upper torso. I just stood there and did nothing. The reason I didn't do nothing is (lets out a breath) is 'cause she was black. If it would have been a white girl I probably would have stopped him, but I didn't. I just seen faces of other people and I thought she deserved it. Then we went - after it was over we went back to the car, we got the garbage bag, we put it over her head, he picked up the top of her, I picked up the bottom of her and we took her back to the car and we put her in the trunk and then we drove out of Dodge Park, took a right, I'm not exactly sure how far we drove, all I know is [we] drove not even two minutes (lets out a breath). Jeremy said this - this is the place right here, we can dump her right here. We got out of the car, we looked around to see if there was any other cars coming, and when there wasn't we opened up the trunk of the car, we took her off into the woods, I'm not exactly sure how far we went into the woods or how (pause)

[Officer]: You're doing fine. Just relax, if you're not exactly sure, you're not exactly sure. Just take a breath and relax.

[Barnett]: I'm not exactly sure how far. We dropped her body. We took the bag off her - we went back to the car. We got back to my house, we cleaned out the trunk the best we could, burned the bag, burned the clothes Jeremy had on. (pause) We sat down and we talked about what we had just done and how that we'd never talk about it again and we haven't.

At other points in the interview, when asked specifically about the removal of Bush's clothes, Barnett stated that Sheets removed them. Barnett also stated that Sheets, and not Barnett, had raped, beaten, and stabbed Bush. In the taped confession, Barnett provided statements that the murder was racially motivated and expressed concern about his safety in prison when inmates found out he did not stop Sheets from killing Bush because she was black. One of the interviewing officers testified that Barnett had expressed similar concerns prior to the start of the interview and that Barnett had stated he did not want to go to the Douglas County Correctional Center.

After making his statements to the police, Barnett was placed in the Washington County jail. Around October 31, 1996, he made statements to other inmates at the jail indicating that he was concerned about his potential sentencing. The record also contains evidence that while in jail, Barnett recanted his statements on several occasions to a family member, his girl friend, a cellmate, and Sheets' wife. Pursuant to the plea agreement, Barnett made a telephone call to Sheets, which the record indicates did not produce any clearly incriminating statements from Sheets. Barnett refused to accompany police to the crime scene. The record is not clear if this was because Barnett was seeking a new attorney or because he was not intending to comply with the agreement.

On November 13, 1996, Barnett committed suicide in his jail cell. On February 25, 1997, a hearing was held in Douglas County District Court on the State's notice of intent to offer statements of unavailable witness at trial. Following the hearing, the district court issued an order determining that the State had met its burden of proof to demonstrate that Barnett's statements were trustworthy, finding the statements admissible under either Neb. Rev. Stat. § 27-804(2)(c) (Reissue 1995), the hearsay

exception for statements against penal interest, or § 27-804(2)(e), the residual hearsay exception. Section 27-804(2) provides:

> Subject to the provisions of section 27-403, the following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> . . . .
>
> (c) A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

At trial, the jury was allowed to hear Barnett's confession in its entirety, over Sheets' Confrontation Clause and hearsay objections. Other evidence was adduced at trial concerning the nature of the friendship between Sheets and Barnett at the time the confession was made. Some evidence indicated that the two were as close as ever. Other evidence indicated that the relationship had become strained. Evidence was also provided about the sexual encounter between Sheets and Barnett's girl friend and Barnett's later recantations in which he stated that neither he nor Sheets was involved in the crime and that he had made up the story to impress people at a party.

Sheets was convicted of first degree murder and use of a knife to commit a felony. On June 27, 1997, a hearing was conducted before a three-judge sentencing panel to determine whether Sheets would be sentenced to life imprisonment or death. After consideration of the aggravating and mitigating circumstances set forth in Neb. Rev. Stat. § 29-2523 (Reissue 1995) and the nonstatutory mitigating circumstances offered by Sheets, the panel conducted a comparative review pursuant to Neb. Rev. Stat. § 29-2522(3) (Reissue 1995). Two of the three judges ultimately determined that the death penalty should be imposed. The third judge, however, dissented, based upon his finding that

the State had not proved beyond a reasonable doubt that the murder was "especially heinous, atrocious, [or] cruel," within the meaning of § 29-2523(1)(d). That same member of the panel therefore concluded that the proper punishment should be a life sentence, rather than the imposition of a sentence of death. A death sentence was imposed on the charge of murder in the first degree based upon the 2-to-1 vote of the sentencing panel. Sheets' mandatory direct appeal was docketed in this court pursuant to Neb. Rev. Stat. § 29-2525 (Reissue 1995).

## ASSIGNMENTS OF ERROR

Rephrased, Sheets assigns that the district court erred in (1) admitting the tapes of Barnett's confession in violation of Neb. Rev. Stat. § 27-802 (Reissue 1995), § 27-804, and Sheets' right to confront witnesses against him, pursuant to Neb. Const. art. I, § 11, and the 6th and 14th Amendments to the U.S. Constitution; (2) admitting a memorandum regarding Sheets' service in the U.S. Navy; and (3) not allowing him to treat Officer Bill Jadlowski as a hostile witness. Sheets assigns that the sentencing panel erred in its application of aggravating and mitigating circumstances, in the performance of its comparative review, and in the imposition of the death penalty on a vote of 2 to 1.

## STANDARD OF REVIEW

Whether statements fall within a firmly rooted hearsay exception for Confrontation Clause purposes is a question of law. *Lilly v. Virginia*, 527 U.S. 116, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999). On a question of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below. *State v. Bottolfson*, 259 Neb. 470, 610 N.W.2d 378 (2000).

When determining whether the admission of a declarant's out-of-court statements violates the Confrontation Clause, an appellate court independently reviews whether the government's proffered guarantees of trustworthiness satisfy the demands of the clause. *Lilly, supra*; *U.S. v. Castelan*, 219 F.3d 690 (7th Cir. 2000). Historical facts are reviewed for clear error. *Lilly, supra*.

## ANALYSIS

The primary issue in this case is whether the admission into evidence of Barnett's confession, consisting of hearsay statements made to investigating authorities pursuant to a plea agreement, violated Sheets' right to confrontation. Although Sheets also assigned as error the admission into evidence of the hearsay statements under §§ 27-802 and 27-804, he does not argue this in his brief. Errors that are assigned but not argued will not be addressed by an appellate court. *State v. Dixon*, 259 Neb. 976, 614 N.W.2d 288 (2000); *State v. Baue*, 258 Neb. 968, 607 N.W.2d 191 (2000). Accordingly, we do not address whether the district court erred in admitting the confession into evidence under §§ 27-802 and 27-804 and only address the issue of whether Sheets' confrontation rights were violated.

The Confrontation Clause, U.S. Const. amend. VI, provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." Accord Neb. Const. art. I, § 11.

> [T]he Clause envisions "a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief."

*Ohio v. Roberts*, 448 U.S. 56, 63-64, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980). "The Confrontation Clause reflects 'the ancient faith of the common law, incorporated by the founders in the Bill of Rights, that live confrontation and cross-examination of witnesses in the courtroom is the key to finding truth in a criminal trial.' " *U.S. v. Flores*, 985 F.2d 770, 780 (5th Cir. 1993). Thus, the U.S. Supreme Court has stated that the Confrontation Clause forces all witnesses " 'to submit to cross-examination, the "greatest legal engine ever invented for the discovery of truth." ' " *Lilly*, 527 U.S. at 124, quoting *California v. Green*, 399 U.S. 149, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970). See, also, *State v. Hughes*, 244 Neb. 810, 510 N.W.2d 33 (1993). "The Confrontation Clause should be abrogated only when the evi-

dence is sufficiently reliable and trustworthy that it obviates the need to explore the state of mind of the declarant." *Hughes*, 244 Neb. at 816, 510 N.W.2d at 38, citing *White v. Illinois*, 502 U.S. 346, 112 S. Ct. 736, 116 L. Ed. 2d 848 (1992), and *Roberts, supra*.

A confession of an accomplice that incriminates a criminal defendant is deemed to be inherently unreliable. *Lilly v. Virginia*, 527 U.S. 116, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999); *Lee v. Illinois*, 476 U.S. 530, 106 S. Ct. 2056, 90 L. Ed. 2d 514 (1986); *Hughes, supra*. Thus, over the years, the U.S. Supreme Court has " 'spoken with one voice in declaring presumptively unreliable accomplices' confessions that incriminate defendants.' " *Lilly*, 527 U.S. at 131, quoting *Lee, supra*. See, also, *Hughes, supra* (statements made while in police custody and in which another party is implicated are highly suspect and presumptively unreliable). The burden is on the State to overcome this strong presumption of unreliability. See *Hughes, supra*.

In *Roberts, supra*, the U.S. Supreme Court determined that when a witness is unavailable for cross-examination, his or her statements are admissible only if they bear adequate indicia of reliability. Reliability can be inferred, without more, in a case in which the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, absent a showing by the State of particularized guarantees of trustworthiness. *Id.*; *Hughes, supra*. Thus, the *Roberts* analysis requires the application of a two-part test: (1) a determination of whether the statements fall within a firmly rooted hearsay exception and (2) if they do not, whether they have particularized guarantees of trustworthiness. *Hughes, supra*. Accordingly, we next consider whether Barnett's confession was admissible under either part of the *Roberts* test.

### FIRMLY ROOTED ANALYSIS

The first question is whether an alleged accomplice's custodial statements that inculpate a criminal defendant fall under a firmly rooted hearsay exception. Hearsay that falls within a firmly rooted hearsay exception is presumptively reliable and trustworthy; therefore, inferring reliability of such

statements will not violate a defendant's confrontation rights. *Hughes, supra*, citing *Roberts, supra*, and *Flores, supra*. In *Idaho v. Wright*, 497 U.S. 805, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990), the Court determined that a residual exception identical to § 27-804(2)(e) was not a firmly rooted exception for Confrontation Clause purposes. Accordingly, we focus only on whether statements against penal interest admitted pursuant to § 27-804(2)(c) fall under a firmly rooted exception.

We note that § 27-804(2)(c) uses the term "statement" in a narrow sense to refer to a specific declaration or remark incriminating the speaker and not more broadly to refer to the entire narrative portion of the speaker's confession. See, *Williamson v. United States*, 512 U.S. 594, 114 S. Ct. 2431, 129 L. Ed. 2d 476 (1994); *U.S. v. Mendoza*, 85 F.3d 1347 (8th Cir. 1996). In this case, however, the entire confession, consisting of multiple statements, was introduced into evidence. The record is silent on whether the district court considered the separate admissibility of each of the statements contained in Barnett's confession, and the State did not ask the district court to parse Barnett's individual statements for Confrontation Clause analysis. Compare *U.S. v. Castelan*, 219 F.3d 690 (7th Cir. 2000).

During the time this appeal was pending, the U.S. Supreme Court decided *Lilly v. Virginia*, 527 U.S. 116, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999). In *Lilly*, an accomplice of the defendant made statements to the police after he was taken into custody that inculpated the defendant in the crime. At trial, the accomplice invoked his Fifth Amendment privilege against self-incrimination. The trial court then admitted the accomplice's statements to the police as statements against interest. All nine justices of the Court agreed that the admission into evidence of the accomplice's statements violated the defendant's right to confrontation. A plurality of the Court concluded that a confession by an accomplice which incriminates a criminal defendant does not fall under a firmly rooted hearsay exception. *Id.*

In determining that the accomplice's statements in *Lilly* did not fall under a firmly rooted exception, the plurality defined a hearsay exception as firmly rooted "if, in light of 'longstanding judicial and legislative experience,' . . . it 'rest[s] [on] such [a] solid foundatio[n] that admission of virtually any evidence

within [it] comports with the "substance of the constitutional protection." ' " 527 U.S. at 126, quoting *Wright, supra,* and *Ohio v. Roberts,* 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980).

> This standard is designed to allow the introduction of statements falling within a category of hearsay whose conditions have proved over time "to remove all temptation to falsehood, and to enforce as strict an adherence to the truth as would the obligation of an oath" and cross-examination at a trial.

*Lilly,* 527 U.S. at 126. The plurality noted the Court's prior determination that "due to the sweeping scope of the label, the simple categorization of a statement as a ' " 'declaration against penal interest' " . . . defines too large a class for meaningful Confrontation Clause analysis.' " *Lilly,* 527 U.S. at 127, quoting *Lee v. Illinois,* 476 U.S. 530, 106 S. Ct. 2056, 90 L. Ed. 2d 514 (1986). See, also, *State v. Hughes,* 244 Neb. 810, 510 N.W.2d 33 (1993). The plurality determined that the practice of admitting statements of an accomplice that incriminate a criminal defendant are of quite recent vintage. Most importantly, such statements are deemed to be inherently unreliable. Following an analysis of previous decisions affecting the issue, the plurality concluded that "accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence." *Lilly,* 527 U.S. at 134.

Three concurring justices in *Lilly* reserved the possibility that "a genuinely self-inculpatory statement that also inculpates a codefendant" might nevertheless satisfy a firmly rooted hearsay exception. 527 U.S. at 146 (Rehnquist, C.J., concurring). However, the concurring justices distinguished between such a statement and statements given as "part of a custodial confession of the sort that this Court has viewed with 'special suspicion.' " *Id.* Accord *U.S. v. Gomez,* 191 F.3d 1214 (10th Cir. 1999). See, generally, *Williamson v. United States,* 512 U.S. 594, 114 S. Ct. 2431, 129 L. Ed. 2d 476 (1994). Thus, some courts, prior to *Lilly,* have determined that statements made under circumstances not present in this case, such as statements to people unconnected with law enforcement, were genuinely

self-inculpatory and, thus, fell under a firmly rooted hearsay exception. See, e.g., *Richardson v. Bowersox*, 188 F.3d 973 (8th Cir. 1999), *cert. denied* 529 U.S. 1113, 120 S. Ct. 1971, 146 L. Ed. 2d 801 (2000); *U.S. v. York*, 933 F.2d 1343 (7th Cir. 1991), *overruled on other grounds, Wilson v. Williams*, 182 F.3d 562 (7th Cir. 1999); *U.S. v. Seeley*, 892 F.2d 1 (1st Cir. 1989). See, also, *Neuman v. Rivers*, 125 F.3d 315 (6th Cir. 1997) (statement did not implicate defendant at all).

Other courts have specifically addressed the difference between statements made outside of police custody and statements made while in custody, noting that the latter is presumed to be unreliable. See, e.g., *U.S. v. Moses*, 148 F.3d 277 (3d Cir. 1998), *cert. denied* 525 U.S. 1148, 119 S. Ct. 1047, 143 L. Ed. 2d 53 (1999); *U.S. v. Barone*, 114 F.3d 1284 (1st Cir. 1997); *U.S. v. Costa*, 31 F.3d 1073 (11th Cir. 1994); *U.S. v. Matthews*, 20 F.3d 538 (2d Cir. 1994); *Olson v. Green*, 668 F.2d 421 (8th Cir. 1982); *Barrow v. State*, 749 A.2d 1230 (Del. 1999); *Smith v. State*, 746 So. 2d 1162 (Fla. App. 1999); *State v. Nieto*, 186 Ariz. 449, 924 P.2d 453 (Ariz. App. 1996); *State v. Kimble*, 688 So. 2d 552 (La. App. 1996).

Courts that have considered the issue after *Lilly v. Virginia*, 527 U.S. 116, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999), have overwhelmingly found that confessions of an accomplice that inculpate a criminal defendant are not within a firmly rooted hearsay exception, especially when such statements are made to law enforcement authorities. See, e.g., *U.S. v. Robbins*, 197 F.3d 829 (7th Cir. 1999); *U.S. v. Gomez, supra*; *U.S. v. Lopez-Caceres*, 89 F. Supp. 2d 168 (D. Puerto Rico 1999); *U.S. v. Gibson*, 84 F. Supp. 2d 784 (S.D.W. Va. 2000); *U.S. v. Valenzuela*, 53 F. Supp. 2d 992 (N.D. Ill. 1999); *State v. Madrigal*, 87 Ohio St. 3d 378, 721 N.E.2d 52 (2000), *reconsideration denied* 88 Ohio St. 3d 1428, 723 N.E.2d 1115 (2000); *Shinn v. Iowa Mut. Ins. Co.*, 610 N.W.2d 538 (Iowa App. 2000); *Rankins v. Com.*, 31 Va. App. 352, 523 S.E.2d 524 (2000); *Barrow, supra; Smith, supra; People v. Quick*, 308 Ill. App. 3d 474, 720 N.E.2d 1137, 242 Ill. Dec. 182 (1999), *appeal denied* 188 Ill. 2d 578, 729 N.E.2d 502, 246 Ill. Dec. 129 (2000). See, generally, *U.S. v. Egan*, 53 M.J. 570 (A. Crim. App. 2000); *Com. v. Young*, 561 Pa. 34, 748 A.2d 166 (2000); *State v. Tangie*, No.

98-0896, 2000 WL 142096 (Iowa App. Feb. 9, 2000), *vacated on other grounds* 616 N.W.2d 564 (Iowa 2000); *State v. Dinkins*, 339 S.C. 597, 529 S.E.2d 557 (S.C. App. 2000). See, also, *Richardson v. Bowersox, supra* (recognizing that use of statements of codefendants that inculpate different criminal defendant would be prohibited, but allowing statements that only inculpated declarant). See, generally, *Dearing v. Com.*, 259 Va. 117, 524 S.E.2d 121 (2000).

Applying an analysis similar to that of the plurality in *Lilly*, we have previously held that statements against interest pursuant to § 27-804(2)(c) do not fall under a firmly rooted hearsay exception. In particular, we stated:

> [S]tatements made while the declarant is in police custody and in which the declarant implicates another party are highly suspect and presumptively unreliable. . . . Generally, the circumstances surrounding the making of these statements necessitate an exploration of the declarant's state of mind. It cannot be said, without a specific showing of trustworthiness, that such a statement should be admitted without an opportunity for cross-examination.

*State v. Hughes*, 244 Neb. 810, 817, 510 N.W.2d 33, 38 (1993), citing *Lee v. Illinois*, 476 U.S. 530, 106 S. Ct. 2056, 90 L. Ed. 2d 514 (1986), and *Olson v. Green*, 668 F.2d 421 (8th Cir. 1982). We noted that statements made in response to police interrogation generally do not have inherent guarantees of reliability and trustworthiness. "A statement made by a person subject to criminal liability, in which the declarant incriminates a third party, may be the result of the declarant's motivation and opportunity to curry favor with the authorities." *Hughes*, 244 Neb. at 818, 510 N.W.2d at 38-39. Thus, we held in *Hughes* that "reliability of statements that fall within the hearsay exception for statements against penal interests may not be inferred, and the proponent of such evidence must carry the burden of demonstrating the trustworthiness and reliability of the statement." 244 Neb. at 818, 510 N.W.2d at 39, citing *U.S. v. Flores*, 985 F.2d 770 (5th Cir. 1993).

We conclude that to the extent § 27-804(2)(c) encompasses inherently unreliable statements, it is not a firmly rooted

hearsay exception for purposes of Confrontation Clause analysis. In this case, the statements in Barnett's confession inculpating Sheets were made while Barnett was in police custody. Such statements are presumptively unreliable. Thus, the statements did not fall within a firmly rooted hearsay exception. See, *Lilly v. Virginia*, 527 U.S. 116, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999); *U.S. v. Gomez*, 191 F.3d 1214 (10th Cir. 1999); *Flores, supra; Hughes, supra*. Accordingly, we next address whether the State has shown that the statements had particularized guarantees of trustworthiness under the second portion of the *Roberts* test.

### GUARANTEES OF TRUSTWORTHINESS

Sheets contends that the State did not meet its burden to prove that Barnett's statements had particularized guarantees of trustworthiness. Sheets points to the fact that Barnett's statements were given while he was in custody and pursuant to a plea agreement. The confession inculpated Sheets in the crime and portrayed Sheets as the person who physically raped, beat, and killed Bush. Sheets further notes that Barnett made previous inconsistent statements about the crime and that Barnett later recanted his own and Sheets' involvement. The State, however, argues that statements in Barnett's confession were not made in response to leading questions and that the police did not provide Barnett with details of the crime. The State contends that because Barnett was counseled by an attorney, incriminated himself substantially in the commission of the crime, and promised to be truthful, the presumption of unreliability has been rebutted.

We independently review the State's proffered guarantees of trustworthiness. The Court stated in *Lilly*:

> Nothing in our prior opinions, however, suggests that appellate courts should defer to lower courts' determinations regarding whether a hearsay statement has particularized guarantees of trustworthiness. To the contrary, those opinions indicate that we have assumed, as with other fact-intensive, mixed questions of constitutional law, that "[i]ndependent review is . . . necessary . . . to maintain control of, and to clarify, the legal principles" governing the factual circumstances . . . .

*Lilly*, 527 U.S. at 136, quoting *Ornelas v. United States*, 517 U.S. 690, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996). The presence or absence of historical facts are reviewed for clear error. *Id.*

To determine whether a statement against penal interests meets the second prong of the *Roberts* test, a court must examine the totality of the circumstances surrounding the making of the statement to determine whether the statement has particularized guarantees of trustworthiness such that adversarial testing would be expected to add little, if anything, to its reliability. *State v. Hughes*, 244 Neb. 810, 510 N.W.2d 33·(1993), citing *Idaho v. Wright*, 497 U.S. 805, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990). See, also, *State v. Palser*, 238 Neb. 193, 469 N.W.2d 753 (1991). Thus, hearsay admitted under the Confrontation Clause must be so trustworthy that cross-examination of the declarant would be of marginal utility. *Wright, supra.* See *Hughes, supra.* There is no mechanical test for determining whether a statement bears particularized guarantees of trustworthiness under the clause. *Wright, supra.* However, we stated in *Hughes* that particularly relevant to the determination of trustworthiness is whether the declarant was in police custody when the statement was made, whether the declarant had motive to mitigate his or her own criminal liability, and whether the declarant made the statement in response to leading questions. See, also, *Lee v. Illinois*, 476 U.S. 530, 106 S. Ct. 2056, 90 L. Ed. 2d 514 (1986).

When a court examines the totality of the circumstances, it is important to note that evidence tending to corroborate the content of a hearsay statement cannot support a finding that the statement bears particularized guarantees of trustworthiness. *Lilly v. Virginia*, 527 U.S. 116, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999); *U.S. v. Flores*, 985 F.2d 770 (5th Cir. 1993); *Hughes, supra*, citing *Wright, supra.* If the circumstances indicate a likelihood that the declarant had a motive to lie, there is a greater need to cross-examine the declarant, and corroborating evidence is not a substitute for that need to explore the declarant's motivation. *Id.* The analysis of whether the second prong of the *Roberts* test has been met is the same when reviewing statements admitted under either § 27-804(2)(c) or (e). See, *Wright, supra*; *Hughes, supra.*

In this case, statements in Barnett's confession are of the kind that historically have caused the greatest concern. The statements were made while Barnett was in custody, and the confession acted to inculpate Sheets in the crime. In statements made to nonundercover law-enforcement personnel after the commission of the offense, "there always exists the strong possibility that the declarant has the 'desire to shift or spread blame, curry favor, avenge himself, or divert attention to another.'" *Flores*, 985 F.2d at 780.

In *Lilly v. Virginia*, 527 U.S. 116, 137, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999), the Court stated:

> It is highly unlikely that the presumptive unreliability that attaches to accomplices' confessions that shift or spread blame can be effectively rebutted when the statements are given under conditions that implicate the core concerns of the old *ex parte* affidavit practice—that is, when the government is involved in the statements' production, and when the statements describe past events and have not been subjected to adversarial testing.

See, also, *Flores, supra.* The Seventh Circuit Court of Appeals recently stated:

> Since *Lilly* was decided, no circuit has yet determined if— and under what circumstances—an accomplice's custodial confession implicating a defendant can ever be deemed to possess sufficient inherent indicia of trustworthiness to satisfy the Confrontation Clause. Thus, the full scope of *Lilly* remains undefined. At least one treatise has explained that in *Lilly* "all nine justices of the Supreme Court indicated, more or less explicitly, that the admission of custodial statements to law enforcement personnel against penal interest . . . whether or not constituting a confession, that incriminate another person violates the confrontation clause when admitted against such other person in a criminal case."

*U.S. v. Castelan*, 219 F.3d 690, 695 (7th Cir. 2000), quoting 31 Michael H. Graham, Federal Practice and Procedure § 6742 (2d ed. 2000).

The suggestion that Barnett had a motive to curry favor with authorities is especially strong in this case. Of most importance,

Barnett made his statements pursuant to a plea bargain, thereby avoiding a charge of first degree murder. Although the maximum sentence Barnett might have received for either first or second degree murder was a life sentence because he was 17 years of age at the time the crime was committed, the minimum would be dramatically different. Under the relevant statutes, Barnett would have been subject to a 10-year minimum sentence of imprisonment for second degree murder. See Neb. Rev. Stat. §§ 28-304 and 28-105 (Reissue 1995). Further, as part of the agreement, the State agreed not to bring a weapons charge against Barnett. The sentence for such a charge would have been a maximum of 20 years' imprisonment, a $25,000 fine, or both, and the minimum would have been 1 year's imprisonment. See Neb. Rev. Stat. §§ 28-1205 and 28-105 (Reissue 1995). The sentence would have run consecutively to the murder sentence. See § 28-1205. Barnett's attorney testified that although the matter was not really discussed, one could hope to serve the minimum amount of time when time off for good behavior was considered, which in this case would be 5 years' imprisonment.

The record shows that Barnett stated to investigating officers his fear that he would be harmed in jail because he was implicated in the killing of a black woman due to racial animus. Thus, the plea bargain specifically included promises on the part of the State to provide for Barnett's protection. Following his confession, Barnett was housed in the Washington County jail instead of in the Douglas County jail. This indicates a strong motive for Barnett to seek to curry favor with the authorities. See *U.S. v. Flores*, 985 F.2d 770 (5th Cir. 1993). Additionally, Barnett expressed concerns about the length of time he might spend in jail under the plea bargain, asking others in the Washington County jail about what sentence they thought he might receive for second degree murder and how much time he might actually serve.

The absence of any specific agreement regarding the maximum sentence does not lessen the possibility that Barnett was seeking favorable treatment. See, generally, *Garrison v. State*, 726 So. 2d 1144 (Miss. 1998) (although declarant was never offered, nor did he receive, favorable treatment, it could be perceived that in declarant's mind, guilty plea might engender

favorable treatment when declarant held out hope for alternative sentencing as minor). As the 10th Circuit Court of Appeals has stated:

> [T]he *presence* of a plea agreement, even after the defendant has been convicted, also would not serve as an indicia of trustworthiness because the declarant would have a strong desire to curry favor with the government and divert attention to another in the "hopes that the government will make favorable recommendations to the sentencing judge."
> . . . Even after sentencing, these motives may exist because "the government still possesses influence regarding the security level and location of the prison where the [declarant] is to be incarcerated."

*Flores*, 985 F.2d at 782 n.25, quoting *U.S. v. Gomez-Lemos*, 939 F.2d 326 (6th Cir. 1991). See, generally, *U.S. v. Hazelett*, 32 F.3d 1313 (8th Cir. 1994). Thus, courts generally find that custodial statements made pursuant to an express or implied offer of leniency do not have the particularized guarantees of trustworthiness necessary to satisfy the Confrontation Clause. See, e.g., *U.S. v. Castelan*, 219 F.3d 690 (7th Cir. 2000); *U.S. v. Gomez*, 191 F.3d 1214 (10th Cir. 1999); *State v. Lopez*, 128 N.M. 410, 993 P.2d 727 (1999); *State v. Nieto*, 186 Ariz. 449, 924 P.2d 453 (Ariz. App. 1996); *Wilson v. State*, 334 Md. 313, 639 A.2d 125 (1994). See, generally, *Flores, supra*; *Garrison, supra*; *Brown v. State*, 953 P.2d 1170 (Wyo. 1998).

In essence, Barnett implicated Sheets as the mastermind and primary actor and himself as subjectively, if not actually, a less culpable accomplice. Meanwhile, in exchange for Barnett's testimony against Sheets, he arranged a plea bargain in which he received a reduced charge, an agreement not to file a weapons charge, and a commitment for his safety while incarcerated. Barnett then made his statements pursuant to that agreement. A circumstance in which a declarant admits his or her presence and participation in a crime, but indicates that another was the "mastermind" or primary actor, is one of the more common fact patterns in which courts hold that a declarant's statements inculpating the defendant may not be admitted at trial. See, e.g., *Lilly v. Virginia*, 527 U.S. 116, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999); *Williamson v. U.S.*, 512 U.S. 594, 114 S. Ct. 2431, 129

L. Ed. 2d 476 (1994) (Ginsberg, J., concurring); *Hazelett, supra*; *U.S. v. Magana-Olvera*, 917 F.2d 401 (9th Cir. 1990); *U.S. v. Valenzuela*, 53 F. Supp. 2d 992 (N.D. Ill. 1999). See, also, *State v. Kimble*, 688 So. 2d 552 (La. App. 1996) (finding that statement was not truly self-inculpatory under these circumstances); *People v. Farrell*, 10 P.3d 672 (Colo. App. 2000) (declarant pointed to defendant as leader).

Also of concern is the possible motive Barnett may have had to seek revenge against Sheets because of the sexual encounter that occurred between Sheets and Barnett's girl friend. The record could support two different conclusions: (1) that Sheets and Barnett were best friends and were very close at the time Barnett made his statements to the police or (2) that the friendship was no longer very close and had become strained. With the burden placed on the State to prove guarantees of trustworthiness, the possibility, supported by the record, that Sheets and Barnett had a falling out leads to the conclusion that Barnett had a potential motive to shift or spread blame to Sheets and to focus on Sheets in attempting to curry favor with authorities. Given this potential motive to shift or spread blame to Sheets, cross-examination of Barnett on this issue would certainly have been of more than marginal utility. See *Idaho v. Wright*, 497 U.S. 805, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990).

The State contends that Barnett's statements have particularized guarantees of trustworthiness for several reasons. First, the State contends that the plea bargain is of little significance and offers as a guarantee of trustworthiness the fact that Barnett, in his confession, did not exonerate himself or mitigate his criminal liability. However, Barnett's confession inculpated Sheets as the person who physically carried out the crimes. According to Barnett, it was Sheets who removed Bush's clothes, Sheets who raped her, Sheets who beat her, and Sheets who stabbed and killed her.

 The fact that Barnett made a broadly self-inculpatory confession does not make more reliable the confession's non-self-inculpatory parts. *U.S. v. Gomez*, 191 F.3d 1214 (10th Cir. 1999), citing *Williamson, supra*. See, *Lilly, supra*; *Farrell, supra*. See, also, *U.S. v. Flores*, 985 F.2d 770 (5th Cir. 1993). "One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because

of its self-inculpatory nature." *Williamson*, 512 U.S. at 599-600. Further,

> it is no longer clear whether considering the degree to which a statement is against penal interest is even permissible: this factor "merely restates the fact that portions of his statements were technically against penal interest." . . . "[S]uch statements [against penal interest] are suspect insofar as they inculpate other persons. '[T]hat a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts.'"

*Gomez*, 191 F.3d at 1223, quoting *Williamson, supra*. Accord, *Lilly v. Virginia*, 527 U.S. 116, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999); *Farrell, supra*. See, also, *Flores, supra* (noting that declarant must make incriminating statement in order to fit within exception in first place). In addition, a clear distinction cannot be drawn between cases in which a declarant shifts the entire blame to the defendant and those in which the declarant spreads the blame both to himself or herself and to the defendant. Thus, it has been held that a statement does not have sufficient indicia of reliability even when the declarant placed a large portion of the blame on himself or herself but also inculpated others. *Crespin v. State*, 144 F.3d 641 (10th Cir. 1998), *cert. denied* 525 U.S. 950, 119 S. Ct. 378, 142 L. Ed. 2d 313.

The State next points to the fact that Barnett was represented by counsel as an indication of trustworthiness. The fact that Barnett was represented by counsel has little bearing on whether the statement was free from any desire, motive, or impulse Barnett may have had either to mitigate the appearance of his own involvement or to overstate Sheets' involvement. See *Lilly, supra*, and *Lee v. Illinois*, 476 U.S. 530, 106 S. Ct. 2056, 90 L. Ed. 2d 514 (1986) (making this statement in regard to voluntary nature of statement). In statements made to nonundercover law enforcement personnel after the commission of the offense, "there always exists the strong possibility that the declarant has the 'desire to shift or spread blame, curry favor, avenge himself, or divert attention to another.'" *Flores*, 985 F.2d at 780. The presence of an attorney does not provide an indication that such motives are absent. Rather, the fact that Barnett made the taped statement after using counsel to obtain a plea agreement equally

indicates that the statement was made to obtain leniency. Further, after he retained and consulted at length with his attorney, Barnett made two different and conflicting statements to authorities. The presence of an attorney did not prevent Barnett from providing authorities with inconsistent and, thus, less trustworthy statements. Accordingly, we find the presence of an attorney under the circumstances of this case to be irrelevant as a factor showing that Barnett's statements had particularized guarantees of trustworthiness.

The State also points to the fact that Barnett's statements were not made as the result of police coercion and that Barnett agreed to be truthful when giving his statements. The U.S. Supreme Court has said that whether a statement is voluntary for Fifth Amendment purposes does not bear on the question of whether the confession was also free from any desire, motive, or impulse of the declarant to mitigate his or her own culpability by spreading or shifting blame to the defendant. *Lee, supra.* See, also, *U.S. v. Valenzuela*, 53 F. Supp. 2d 992 (N.D. Ill. 1999). Thus, a lack of coercion is irrelevant.

That Barnett promised to be truthful as part of the plea agreement is also of little help. Before making the agreement, Barnett was already facing a charge of first degree murder. He gained a reduced charge by entering into the plea agreement and agreeing to make statements to the police and to testify against Sheets. Had he not carried through with the terms of the agreement, Barnett would have been no worse off than he was originally when he was facing a charge of first degree murder. Thus, Barnett had nothing to lose and everything to gain by making a confession in which he inculpated Sheets. See, *U.S. v. Mendoza*, 85 F.3d 1347 (8th Cir. 1996); *U.S. v. Hazelett*, 32 F.3d 1313, 1318 (8th Cir. 1994) (stating that for all practical purposes, declarant's conviction was assured and that "she had nothing to lose by confessing, and she certainly had nothing to lose by implicating another person, particularly someone more culpable"); *U.S. v. Costa*, 31 F.3d 1073 (11th Cir. 1994). As the U.S. Supreme Court has stated, a reality of the criminal process is that "once partners in a crime recognize that the 'jig is up,' they tend to lose any identity of interest and immediately become antagonists, rather than accomplices." *Lee*, 476 U.S. at 544-45.

Even statements made under oath have at times been considered not to exhibit particularized guarantees of trustworthiness. See, e.g., *U.S. v. Flores*, 985 F.2d 770 (5th Cir. 1993); *U.S. v. Lopez-Caceres*, 89 F. Supp. 2d 168 (D. Puerto Rico 1999).

The State points out that Barnett's statements were not made in response to leading questions. We stated in *State v. Hughes*, 244 Neb. 810, 510 N.W.2d 33 (1993), that whether a statement was made in response to leading questions was one of the factors particularly relevant to the determination of trustworthiness. The State also points to the level of detail provided by Barnett and argues that the police did not provide him with information or details about the crime. Although we agree that these factors do provide some basis for determining trustworthiness, we conclude that such factors cannot overcome the strong presumption of unreliability present in a case such as this where Barnett made the statements while in police custody and where a motive to curry favor with the authorities existed. As the Fifth Circuit Court of Appeals stated in *Flores*, "While the presence of [various] factors . . . doubtless renders a given confession more reliable than it would otherwise be, we are not persuaded that it substantially eliminates any reasonable possibility that the third party inculpatory portions of a confession to law enforcement personnel are unreliable." 985 F.2d at 782. See *United States v. Sarmiento-Perez*, 633 F.2d 1092 (5th Cir. 1981). See, generally, *People v. Quick*, 308 Ill. App. 3d 474, 720 N.E.2d 1137, 242 Ill. Dec. 182 (1999) (listing factors similar to those offered by State as not sufficient to overcome presumption of unreliability). The court in *Flores* further stated:

> The Supreme Court has never allowed the admission against a defendant of a codefendant's hearsay inculpatory statements to law enforcement authorities, although it has suggested that theoretically such hearsay could be admitted in appropriate circumstances. . . . But that suggestion should not drive us to allow a codefendant's confession to law enforcement authorities to be admitted against the defendant merely because the district court is able to fairly recite a litany of factors and conclude that the particular confession has "sufficient indicia of reliability."

985 F.2d at 782.

 In order to satisfy principles of confrontation, there must be enough indication of reliability and trustworthiness that cross-examination would be of marginal utility. *Idaho v. Wright*, 497 U.S. 805, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990). See *Hughes, supra.* " 'The [particularized guarantees of] "trustworthiness" test credits the axiom that a rigid application of the [Confrontation] Clause's standard for admissibility might in the exceptional case exclude a statement of an unavailable witness that is incontestably probative, competent, and reliable, yet nonetheless outside of any firmly rooted exception.' " *U.S. v. Castelan*, 219 F.3d 690, 695 (7th Cir. 2000), quoting *Lilly v. Virginia*, 527 U.S. 116, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999). This, however, is not the exceptional case where the statements are incontestably probative, competent, and reliable. In this case, the government was involved in the production of the statements, the statements were not subjected to adversarial testing, and the statements were made under circumstances in which Barnett had a motive to exaggerate or fabricate Sheets' role. In this case, the presumption of unreliability has not been rebutted. See, e.g., *Vincent v. Seabold*, 226 F.3d 681 (6th Cir. 2000); *U.S. v. Flores*, 985 F.2d 770 (5th Cir. 1993); *United States v. Sarmiento-Perez, supra*; *U.S. v. Valenzuela*, 53 F. Supp. 2d 992 (N.D. Ill. 1999); *U.S. v. Egan*, 53 M.J. 570 (A. Crim. App. 2000); *State v. Hughes*, 244 Neb. 810, 510 N.W.2d 33 (1993); *People v. Quick, supra*; *People v. Farrell*, 10 P.3d 672 (Colo. App. 2000). Although Sheets also raised the fact that Barnett recanted his confession on several occasions, we do not find it necessary to determine whether recantation is a circumstance "exist[ing] at the time the statement was made" and thus a factor to be considered when addressing whether statements have particularized guarantees of trustworthiness. See *Idaho v. Wright, supra.*

The circumstances surrounding the making of the statements in this case suggest three possibilities: (1) It is possible that the murder was committed as described; (2) it is possible that Barnett reversed the roles between Sheets and himself; and (3) it is possible that Sheets had no involvement in the murder whatsoever. Given the circumstances surrounding the making of the statements and Barnett's subsequent death, we cannot say that cross-examination would be of marginal utility.

The Confrontation Clause is not a mere technicality. It is a right of citizens which provides a protection that "responds to ' "something deep in human nature that regards face-to-face confrontation between accused and accuser as 'essential to a fair trial in a criminal prosecution.' " ' " *Flores*, 985 F.2d at 781. Any motive Barnett would have had to lie when incriminating Sheets could be truly explored only by cross-examination. Sheets was denied that right. We conclude that Barnett's statements lack inherent particularized guarantees of trustworthiness. Accordingly, we determine that the district court erred in admitting Barnett's taped confession in its entirety into evidence.

HARMLESS ERROR

The admission into evidence of statements in violation of the Confrontation Clause is subject to a harmless error analysis. See *Hughes, supra.* An erroneous admission of evidence is considered prejudicial to a criminal defendant unless the State demonstrates that the error was harmless beyond a reasonable doubt. *Id.* An error is harmless when the improper admission did not materially influence the jury to reach a verdict adverse to the substantial rights of the defendant. *Id.* In this case, Barnett's taped statements were the primary evidence against Sheets. Accordingly, the admission into evidence of those statements was not harmless beyond a reasonable doubt.

Having found error, we now determine whether the evidence presented by the State was sufficient to sustain the conviction before the cause is remanded for a new trial. In *Lockhart v. Nelson*, 488 U.S. 33, 109 S. Ct. 285, 102 L. Ed. 2d 265 (1988), the Court held that the Double Jeopardy Clause does not forbid retrial so long as the sum of the evidence offered by the State and admitted by the trial court, whether erroneously or not, would have been sufficient to sustain a guilty verdict. See *State v. Anderson*, 258 Neb. 627, 605 N.W.2d 124 (2000). Thus, although we have concluded that Barnett's confession was erroneously admitted, we include such evidence in our analysis of sufficiency of the evidence. See *Lockhart, supra.* We conclude that Barnett's confession was sufficient to sustain Sheets' convictions. Because the erroneously admitted confession was not harmless, we reverse, and remand for a new trial.

## CONCLUSION

We determine that to the extent § 27-804(2)(c) encompasses inherently unreliable statements, it is not a firmly rooted hearsay exception for purposes of Confrontation Clause analysis. We further determine that the State did not meet its burden to prove that statements in Barnett's taped confession had the particularized guarantees of trustworthiness necessary to overcome Sheets' right to confrontation. Finally, we conclude that the admission into evidence of the statements was not harmless. Accordingly, we reverse, and remand for a new trial. Because we reverse on the basis that Sheets' confrontation rights were violated, we do not reach his other assignments of error.

REVERSED AND REMANDED FOR A NEW TRIAL.

WRIGHT, J., concurring.

I join in the majority opinion, but I write separately because I would also consider the fact that Barnett recanted his statement.

We must evaluate whether Barnett's statement contains particularized guarantees of trustworthiness such that adversarial testing would be expected to add little if anything to its reliability. See *Idaho v. Wright*, 497 U.S. 805, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990). In *Wright*, the Court declined to endorse a mechanical test determining particularized guarantees of trustworthiness but did state that evidence corroborating the truth of a hearsay statement cannot be used to support a finding that the statement bears the requisite particularized guarantees of trustworthiness. Thus, the proponent of the statement's reliability is not permitted to bootstrap the statement's admissibility by use of corroborating evidence. "[T]he presence of corroborating evidence more appropriately indicates that any error in admitting the statement might be harmless . . . ." *Wright*, 497 U.S. at 823.

While it is clear that corroborating evidence cannot be used to enhance the reliability of a statement, it is not clear whether such a rule prevents consideration of a recantation of the statement by the declarant. In my opinion, courts can and should consider whether the declarant has recanted a statement. The right to cross-examine is abrogated only when adversarial testing would be expected to add little if anything to its reliability.

What would be of greater significance than the fact that the declarant had recanted the statement? The Confrontation Clause should be abrogated only when the evidence is so sufficiently reliable and trustworthy that it obviates the need to explore the state of mind of the declarant. *White v. Illinois*, 502 U.S. 346, 112 S. Ct. 736, 116 L. Ed. 2d 848 (1992); *State v. Hughes*, 244 Neb. 810, 510 N.W.2d 33 (1993).

Barnett recanted the statement at least four times. He told his mother that he was not present when Bush was murdered, that he would tell the truth at Sheets' preliminary hearing, that he and Sheets were not involved in the murder, and that he could not "send anybody else down for some drunken, stupid thing" he had started and could not get out of. Barnett was referring to an episode where he was drinking with Jason LaNoue and talked about the killing.

Barnett's girl friend spoke with Barnett while he was in jail. She testified that Barnett said he and Sheets had not killed Bush. When she asked Barnett why he had not told the police that it was all a lie, he stated that he had tried to tell the police "it was just a bunch of drunken bull, and they wouldn't believe him." He told her that when he got to trial, "he was going to tell the truth that they didn't do it."

A cellmate of Barnett's in the Washington County jail testified that Barnett told him that neither Barnett nor Sheets had any involvement in the murder of Bush. The cellmate stated that Barnett had made up the story to impress some people at a party.

Sheets' wife testified that she had received a telephone call from Barnett while he was in the Washington County jail and that Barnett told her he had just been "bullshitting" and nothing he had said was true.

In my opinion, Barnett's recantation is of enormous significance in our evaluation of the statement's trustworthiness. The fact that Barnett made prior inconsistent statements and subsequently recanted his confession goes to the very heart of Sheets' right to cross-examine his accuser.

This issue was addressed in *Ryan v. State*, 899 P.2d 1371 (Alaska App. 1995). There, the victim of a sexual assault committed suicide a few hours before she was scheduled to testify before a grand jury. The state secured indictments against the

two defendants, John Ryan and Jerome Trigg, through testimony of a police officer who had interviewed the victim.

During the first interview by police, the victim denied that she had been socializing with the two men who had assaulted her. She claimed that the men had stolen her vehicle and driven away and that her uncle had driven her to a cabin and left. She then entered the cabin, and the men, who appeared to be drunk, ordered her to take off her clothes and assaulted her.

The next day, in a second statement, the victim altered her previous account of how she had arrived at the cabin and how the assault had occurred. She admitted socializing with Ryan and Trigg and driving to the cabin, where the three of them continued to drink. At some point, things got out of hand, and she was assaulted by both men.

Before trial, Ryan and Trigg challenged the admissibility of the victim's statements, but the trial court found that the statements to police were admissible under Alaska Evid. R. 804(b)(5), one of Alaska's two residual hearsay exceptions. The court concluded that the residual hearsay exceptions were not firmly rooted exceptions and, therefore, examined the statements for particularized guarantees of trustworthiness.

The appellate court reversed, stating that its task was to determine whether the statements were so inherently trustworthy, so free from possible doubt, that cross-examination of the victim would yield negligible benefit to Ryan and Trigg as they stood trial for sexual assault. The state claimed that *Idaho v. Wright,* 497 U.S. 805, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990), prohibited consideration of the fact that the victim had made inconsistent statements in evaluating the trustworthiness of the hearsay statement. The court concluded:

> The State's argument, while perhaps ingenious, is inconsistent with both the law and common sense. In judging the reliability of an absent person's assertion, reasonable people would want to know, and would take into account, the fact that the same person had made an inconsistent assertion on another occasion. The case law recognizes and employs this rule of common sense.

*Ryan,* 899 P.2d at 1377 n.3.

I conclude that Barnett's recantation is a circumstance that should be considered.

MILLER-LERMAN, J., concurring.

## INTRODUCTION

I concur in the result reached by the majority; however, I do so based on different reasoning. With respect to the majority's conclusion that the Barnett custodial statement of September 28, 1996, should be excluded because it does not fall within a firmly rooted hearsay exception, I agree. With respect to the majority's analysis that the statement should be excluded as inadmissible hearsay because it lacks particularized guarantees of trustworthiness under the second prong of the test as articulated in *Ohio v. Roberts*, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), I conclude that the Confrontation Clause, rather than the general rule against the admission of hearsay, requires the exclusion of the custodial statement as a constitutional, rather than an evidential, matter.

Under the Sixth Amendment to the U.S. Constitution, a defendant in a criminal prosecution has the right "to be confronted with the witnesses against him." See, also, Neb. Const. art. I, § 11. The U.S. Supreme Court has directed that for "hearsay evidence [to be] admitted under the Confrontation Clause [it must] be so trustworthy that cross-examination of the declarant would be of marginal utility," *Idaho v. Wright*, 497 U.S. 805, 823, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990), and has further stated that the prohibitions of the Confrontation Clause do not "equate . . . with the general rule prohibiting the admission of hearsay statements," 497 U.S. at 814. In this case, I conclude that the cross-examination of Barnett would be of greater than marginal utility and that adversarial testing would add to an assessment of the custodial statement's reliability, and, therefore, the admission of the Barnett statement, which is hearsay, violated the Confrontation Clause. Such admission was not harmless in this case, particularly in light of the fact that Barnett's statement tied the defendant to the crimes. I, therefore, concur in the result reached by the majority that the admission of the custodial statement was reversible error and that the cause should be remanded for a new trial.

ANALYSIS

*Development of* Roberts *in* Wright *and* Lilly.

As stated by the majority, the U.S. Supreme Court initially developed a two-part test for the admissibility of statements of unavailable witnesses in *Roberts, supra.* The Court held that when a hearsay declarant is not present for cross-examination at trial and it is determined that the declarant is unavailable, the Confrontation Clause allows admission of the declarant's statement only if the statement is shown to bear adequate " 'indicia of reliability.' " *Roberts*, 448 U.S. at 66. Such reliability must be demonstrated by showing that (1) the statement falls within a "firmly rooted hearsay exception" or (2) if the statement does not fall within a firmly rooted hearsay exception, it contains "particularized guarantees of trustworthiness." *Id.*

The two parts of the *Roberts* test were intended to be functional equivalents. The Court has stated:

> In *Roberts*, we recognized that even if certain hearsay evidence does not fall within "a firmly rooted hearsay exception" and is thus presumptively unreliable and inadmissible for Confrontation Clause purposes, it may nonetheless meet Confrontation Clause reliability standards if it is supported by a "showing of particularized guarantees of trustworthiness." . . . However, we also emphasized that "[r]eflecting its underlying purpose to augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence, the Clause countenances only hearsay marked with such trustworthiness that 'there is no material departure from the reason of the general rule.' "

(Citations omitted.) *Lee v. Illinois*, 476 U.S. 530, 543, 106 S. Ct. 2056, 90 L. Ed. 2d 514 (1986) (quoting *Roberts, supra*). Evidence possessing "particularized guarantees of trustworthiness" must therefore be at least as reliable as evidence admitted under a firmly rooted hearsay exception. *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980). See, also, *Idaho v. Wright*, 497 U.S. 805, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990).

Under the *Roberts* test, the reliability of evidence which falls within a firmly rooted hearsay exception "can be inferred with-

out more." *Roberts*, 448 U.S. at 66. Statements within a firmly rooted hearsay exception are therefore admissible without an additional explicit Confrontation Clause analysis.

The U.S. Supreme Court developed the *Roberts* test in *Wright, supra*. The Court in *Wright* stated that "[b]ecause evidence possessing 'particularized guarantees of trustworthiness' must be at least as reliable as evidence admitted under a firmly rooted hearsay exception," evidence admitted under the second part of the *Roberts* test must be "so trustworthy that adversarial testing would add little to its reliability." 497 U.S. at 821. The Court in *Wright* further stated that "hearsay evidence admitted under the Confrontation Clause [must] be so trustworthy that cross-examination of the declarant would be of marginal utility." 497 U.S. at 823. See, also, *Wright*, 497 U.S. at 820 ("declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility").

The Court in *Wright* noted that the Confrontation Clause "bars admission of some evidence that would otherwise be admissible under an exception to the hearsay rule." 497 U.S. at 814. However, the Court also recognized that "statements admitted under a 'firmly rooted' hearsay exception are so trustworthy that adversarial testing would add little to their reliability." *Wright*, 497 U.S. at 821. Following the development of the *Roberts* test in *Wright*, it is clear that if a statement can be categorized as falling within a firmly rooted hearsay exception, it is admissible under the Confrontation Clause without further examination; if, however, a statement is not within a firmly rooted hearsay exception but does contain "particularized guarantees of trustworthiness," such statement is nevertheless subject to further Confrontation Clause analysis as to whether the statement is so trustworthy that adversarial testing would add little to its reliability, and cross-examination would be of marginal utility.

In *Lilly v. Virginia*, 527 U.S. 116, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999), a case which involved a custodial statement, the U.S. Supreme Court's plurality opinion states that the Court is adhering to the general framework for Confrontation Clause analysis of hearsay statements set forth in *Roberts*. However, the *Lilly* plurality opinion recites the second part of the *Roberts* test

as requiring that to be admissible, the statement must contain " 'particularized guarantees of trustworthiness' *such that adversarial testing would be expected to add little, if anything, to the statements' reliability.*" (Emphasis supplied.) *Lilly*, 527 U.S. at 125. Although the text of *Lilly* refers to *Roberts* as the source of the foregoing statement, *Roberts* says only that the statement must have "particularized guarantees of trustworthiness." 448 U.S. at 66. The remainder of the test as recited in *Lilly* is a paraphrase of the *Wright* development of the *Roberts* test.

Roberts *Test as Developed by* Wright
*and* Lilly *as Applied to Custodial Statement.*

Synthesizing the cases recited above, I respectfully suggest that the test and method in practice for analyzing the admissibility of a custodial hearsay statement which inculpates a criminal defendant are not entirely clear. I believe that the two-part *Roberts* test has been developed by *Wright* and *Lilly*. Following *Roberts*, *Wright*, and *Lilly*, if a custodial statement falls within a firmly rooted hearsay exception, the statement continues to be admissible without further Confrontation Clause analysis. If, however, the custodial statement does not fall within a firmly rooted hearsay exception, I view the second part of the test, as a practical matter, as now requiring two inquiries: first, an evidential hearsay inquiry as to whether the custodial statement contains particularized guarantees of trustworthiness and, second, a constitutional inquiry driven by the Confrontation Clause as to whether the custodial statement is so trustworthy that adversarial testing would add little to its reliability, and cross-examination would be of marginal utility.

I believe that these two inquiries are separate and distinct. I do not believe that the second inquiry pertaining to adversarial testing and the utility of cross-examination is merely a descriptor of the conclusion reached as a result of the first inquiry pertaining to the examination for particularized guarantees of trustworthiness. I believe a constitutional inquiry is qualitatively different from other inquiries. Thus, I also do not view the constitutional inquiry as just another item of reliability to be evaluated equally along with other garden-variety indicia of reliability in reaching a conclusion as to whether a statement bears particularized guarantees of trustworthiness.

Following *Idaho v. Wright*, 497 U.S. 805, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990), and *Lilly, supra*, and notwithstanding the fact that the Court has not tied the inquiries together with the word "and," I respectfully view the two inquiries of the second prong of the developed *Roberts* test as being conjunctive, and if a custodial statement fails either inquiry, its admission is barred. In particular, I would conclude that if, on an objective basis, adversarial testing would add to an assessment of the custodial statement's reliability and cross-examination would be of greater than marginal utility, the custodial statement's admission is barred as a constitutional matter under the Confrontation Clause, regardless of the outcome of the first inquiry under the second prong of the developed *Roberts* test.

*Application of Developed* Roberts *Test to Instant Case.*

In the instant case, I agree with the majority's conclusion that the statement does not fall within a firmly rooted hearsay exception. Therefore, I am required to analyze the custodial statement under the second prong of the *Roberts* test as developed by *Wright, supra*, and *Lilly v. Virginia*, 527 U.S. 116, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999). Because, as discussed below, I conclude that adversarial testing would add to an assessment of the custodial statement's reliability and that cross-examination would be of greater than marginal utility, I also conclude that the Confrontation Clause bars admission of the custodial statement, and I need not address the first inquiry under the second prong of the developed *Roberts* test by evaluating at length purported guarantees of trustworthiness.

The evidence in the instant case is such that there are numerous matters for which adversarial testing would be useful for assessing the custodial statement's reliability, and cross-examination would be of more than marginal utility in the jury's assessment of Barnett's credibility. Among the matters which objectively ought to be the subject of cross-examination for Confrontation Clause purposes are (1) the nature of Barnett's plea bargain and consequent exposure at sentencing; (2) Barnett's motives to curry favor with the authorities and to exaggerate the defendant's involvement in the crimes while minimizing his own role; (3) the nature of the relationship between

Barnett and the defendant due to their separate sexual relationships with Barnett's girl friend and Barnett's possible motive to seek revenge against the defendant; (4) the nature, motive, and substance of the two statements Barnett gave to the authorities prior to giving the September 28, 1996, statement, which prior statements differed considerably from the statement at issue in this case; and (5) the nature, motive, and substance of several statements Barnett made to various persons recanting his involvement in the crimes after making the statement of September 28.

Each of the above matters would have made cross-examination of Barnett of more than marginal utility, and adversarial testing by cross-examination on these matters would have added significantly to the jury's assessment of Barnett's credibility and the reliability of Barnett's custodial statement in which the defendant is inculpated. The defendant's right of confrontation was particularly implicated in the instant case by the fact that Barnett's custodial statement tied the defendant to the crimes, and it was, therefore, particularly vital that the defendant have the opportunity to subject such evidence to adversarial testing. Admission of the Barnett statement violated the defendant's right to confrontation, and therefore, the admission of the Barnett custodial statement was reversible error, without regard to an assessment of the factors proffered by the State in its supplemental brief filed on July 27, 1999, as evincing guarantees of trustworthiness, and the cause should be remanded for a new trial.

*Relationship Between Hearsay and Confrontation Clause.*

In reaching the foregoing conclusion, I am aware that jurists and scholars have expressed their unease with the jurisprudence surrounding the relationship between the rule against hearsay and the Confrontation Clause as it relates to the admissibility of out-of-court statements by unavailable declarants that inculpate the defendant. See, e.g., *Lilly, supra* (Breyer, J., concurring); *White v. Illinois*, 502 U.S. 346, 112 S. Ct. 736, 116 L. Ed. 2d 848 (1992) (Thomas, J., concurring in part, and concurring in judgment; Scalia, J., joins); Akhil Reed Amar, *Confrontation Clause First Principles: A Reply to Professor Friedman*, 86 Geo. L.J.

1045 (1998); Margaret A. Berger, *The Deconstitutionalization of the Confrontation Clause: A Proposal for a Prosecutorial Restraint Model*, 76 Minn. L. Rev. 557 (1992); Joshua C. Dickinson, *The Confrontation Clause and the Hearsay Rule: The Current State of a Failed Marriage in Need of a Quick Divorce*, 33 Creighton L. Rev. 763 (2000); Richard D. Friedman, *Confrontation: The Search for Basic Principles*, 86 Geo. L.J. 1011 (1998); Benjamin E. Rosenberg, *The Future of Codefendant Confessions*, 30 Seton Hall L. Rev. 516 (2000); *The Supreme Court, 1998 Term—Leading Cases: I. Constitutional Law, B. Criminal Law and Procedure, 1. Confrontation Clause—"Firmly Rooted" Hearsay Exceptions*, 113 Harv. L. Rev. 233 (1999). Much of the commentary is dedicated to the *Roberts* doctrine and its subsequent development by the Court.

As outlined above, initially under *Roberts*, it appeared that hearsay which fell under a firmly rooted exception and hearsay which was found to bear particularized guarantees of trustworthiness were functional equivalents for purposes of admissibility. However, case law subsequent to *Roberts* subjected the non-firmly rooted hearsay to explicit Confrontation Clause scrutiny by asking whether cross-examination of the declarant of a custodial statement would be of marginal utility and whether adversarial testing would add little, while the firmly rooted hearsay exception remained admissible and free of explicit Confrontation Clause analysis. Observers have commented on this discordance between once equally admissible statements by which, currently, statements admitted under a firmly rooted hearsay exception are not subject to explicit Confrontation Clause review, whereas custodial statements sought to be admitted as bearing particularized guarantees of trustworthiness are nevertheless subject to explicit Confrontation Clause scrutiny.

I am aware of the judicial and scholarly discussion regarding the purposes of the Confrontation Clause in general and, in particular, whether the purpose of the Confrontation Clause is to ensure trustworthiness, confrontation, or both. For purposes of this concurrence, I note that Barnett was unavailable. I conclude that the Barnett statement was offered as "witness" testimony against the defendant for Confrontation Clause purposes, *White*

*v. Illinois*, 502 U.S. 346, 112 S. Ct. 736, 116 L. Ed. 2d 848 (1992) (Thomas, J., concurring in part, and concurring in judgment; Scalia, J., joins), and I understand that the trustworthiness of the statement is the focus of the admissibility analysis of the majority. I further note that the Barnett statement at issue was a custodial statement and that a different analysis might apply to noncustodial statements.

As noted above, if a statement fits within a firmly rooted exception to the hearsay rule, its "[r]eliability can be inferred," *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), and it is admitted without further constitutional analysis under the Confrontation Clause. *Id.* The Court has held that firmly rooted exceptions include the following: excited utterances and statements made for purposes of medical diagnosis and treatment, *White v. Illinois*, 502 U.S. 346, 112 S. Ct. 736, 116 L. Ed. 2d 848 (1992); coconspirators' statements, *Bourjaily v. United States*, 483 U.S. 171, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987); and dying declarations, *Mattox v. United States*, 156 U.S. 237, 15 S. Ct. 337, 39 L. Ed. 2d 409 (1895) (as described in *Lilly v. Virginia*, 527 U.S. 116, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999)).

As suggested by the concurrence filed by Justice Breyer in *Lilly*, a criminal defendant would in some cases find cross-examination of the declarant of a firmly rooted hearsay statement which inculpates the defendant of greater than marginal utility, but because of the per se admissibility of the firmly rooted statement, the defendant is not absolutely entitled under the developed *Roberts* test to confront such a witness against him or her. See, also, *The Supreme Court, 1998 Term—Leading Cases: I. Constitutional Law, B. Criminal Law and Procedure, 1. Confrontation Clause—"Firmly Rooted" Hearsay Exceptions*, 113 Harv. L. Rev. 233 (1999). But see, Richard D. Friedman, *Confrontation: The Search for Basic Principles*, 86 Geo. L.J. 1011, 1019 (1998), in which the author states that *Lee v. Illinois*, 476 U.S. 530, 106 S. Ct. 2056, 90 L. Ed. 2d 514 (1986),

> is particularly interesting because it reflects unwillingness on the part of the majority to accept the full implications of the per se aspects of the *Roberts* reliability requirement, as well as implicit recognition that, even if a statement by an

 unavailable declarant fits within a firmly rooted hearsay exception, its admission may violate the confrontation right.

Thus, for example, where a coconspirator inculpates the defendant in an out-of-court statement, without regard to whether the statement was elicited with the aid of undercover law enforcement, the criminal defendant has no absolute right to cross-examine the declarant of such firmly rooted hearsay, notwithstanding that by an objective standard, adversarial testing would add to the fact finder's assessment of the statement's trustworthiness and that cross-examination of the declarant would be of greater than marginal utility. See *Bourjaily, supra.*

As further noted above, if a custodial statement does not fit within a firmly rooted exception to the hearsay rule but it does bear particularized guarantees of trustworthiness, it is nevertheless subject to the additional constitutional inquiry of whether cross-examination of the declarant would be of greater than marginal utility and whether adversarial testing would add to its reliability. Thus, such statements sought to be admitted as bearing particularized guarantees of trustworthiness are required to undergo a constitutional as well as evidential analysis. The confrontation inquiry regarding adversarial testing and whether cross-examination would be of greater than marginal utility, being of a constitutional dimension, is outcome determinative. Such inquiry is qualitatively unlike the evidential inquiry regarding the particularized guarantees of trustworthiness which considers discrete factual matters surrounding the making of the custodial statement, such as whether the declarant was intoxicated, whether the declarant was asked leading questions, whether the declarant had counsel, et cetera, which, in the aggregate, lead to a conclusion regarding trustworthiness.

Given the controlling nature of the constitutional Confrontation Clause inquiry under the second prong of the developed *Roberts* test as applied to a custodial statement, in my view, if cross-examination would be of greater than marginal utility in assessing the credibility of the declarant and adversarial testing regarding the statement would be of benefit, the Confrontation Clause requires exclusion of the custodial statement, regardless of the assessment of the other factors sur-

rounding the making of the custodial statement. To the extent that the purpose of the Confrontation Clause is to determine "trustworthiness," the Confrontation Clause inquiry is neither just another trustworthiness inquiry nor a descriptor of the result of the trustworthiness inquiry; if the answer to the Confrontation Clause inquiry is that adversarial testing would be of benefit to assess the reliability of the custodial statement and cross-examination would be of greater than marginal utility, the statement must be excluded.

Whether statements which fit a firmly rooted exception to the hearsay rule should be subject to explicit Confrontation Clause analysis or, conversely, whether statements which do not fit a firmly rooted exception to the hearsay rule but do bear particularized guarantees of trustworthiness should be freed of explicit Confrontation Clause analysis is the subject of scholarly treatment; the resolution of these questions, however, is not within the scope or authority of this concurrence. Rather, because the current jurisprudence requires a Confrontation Clause analysis of the Barnett custodial statement which was proffered by the State as bearing particularized guarantees of trustworthiness and because I conclude that cross-examination of Barnett would be of greater than marginal utility in evaluating Barnett's credibility and that adversarial testing would add to the fact finder's assessment of the reliability of the statement, I conclude, as a constitutional matter, that admission of the Barnett statement violated the defendant's right to confrontation under the Sixth Amendment. See, also, Neb. Const. art. I, § 11.

## CONCLUSION

I conclude that the *Roberts* test, as it applies to custodial statements for determining the admissibility of statements of unavailable witnesses, has been developed by *Idaho v. Wright*, 497 U.S. 805, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990), and *Lilly v. Virginia*, 527 U.S. 116, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999). If a custodial statement does not fall within the first prong of such test as being a firmly rooted hearsay exception, the statement must be examined under the second prong for particularized guarantees of trustworthiness. With respect to the second prong, I believe, as a practical matter, there are two con-

junctive inquiries: first, an evidential hearsay inquiry as to whether the custodial statement contains particularized guarantees of trustworthiness and, second, a constitutional inquiry driven by the Confrontation Clause as to whether the custodial statement is so trustworthy that adversarial testing would add little to its reliability and cross-examination would be of marginal utility.

In the present case, particularly in light of the fact that Barnett's custodial statement of September 28, 1996, ties the defendant to the crimes, I conclude, without regard to an evaluation of the purported features of its trustworthiness, that adversarial testing would add to the assessment of its reliability and that cross-examination would be of greater than marginal utility. Among the matters which objectively ought to be the subject of cross-examination for Confrontation Clause purposes are (1) the nature of Barnett's plea bargain and consequent exposure at sentencing; (2) Barnett's motives to curry favor with the authorities and to exaggerate the defendant's involvement in the crimes while minimizing his own role; (3) the nature of the relationship between Barnett and the defendant due to their separate sexual relationships with Barnett's girl friend and Barnett's possible motive to seek revenge against the defendant; (4) the nature, motive, and substance of the two statements Barnett gave to the authorities prior to giving the September 28 statement, which prior statements differed considerably from the statement at issue in this case; and (5) the nature, motive, and substance of several statements Barnett made to various persons recanting his involvement in the crimes after making the statement of September 28.

In sum, because I conclude that the defendant's constitutional confrontation right was violated, I agree with the majority's conclusion that the admission of the Barnett statement was reversible error and that the cause should be remanded for a new trial.

McCormack, J., joins in this concurrence.